**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

|  |  |
|---|---|
| KIMBERLY SUE BEAVER, | CASE NO. 3:22-CV-2138 |
| Plaintiff, |  |
| vs. | MAGISTRATE JUDGE AMANDA M. KNAPP |
| COMMISSIONER OF SOCIAL SECURITY, | <u>**MEMORANDUM OPINION AND ORDER**</u> |
| Defendant. |  |

Plaintiff Kimberly Sue Beaver ("Plaintiff" or "Ms. Beaver") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter is before the undersigned by consent of the parties under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  (ECF Doc. 8.)  For the reasons set forth below, the Court **AFFIRMS** the Commissioner's decision.

## I.       Procedural History

Ms. Beaver filed her DIB and SSI applications on February 19, 2019, alleging a disability onset date of February 1, 2017.  (Tr. 15, 221-231.)  She asserted disability due to diabetes Type II, high cholesterol, retinopathy in both eyes, foot drop, neuropathy, recurring urinary tract infections, anxiety, and depression.  (Tr. 83.)  Ms. Beaver's application was denied at the initial level (Tr. 125-44) and upon reconsideration (Tr. 146-61).  She then requested a hearing.  (Tr. 162-64.)

1

A telephonic hearing was held before an Administrative Law Judge ("ALJ") on October 14, 2021.  (Tr. 34-74.)  After the hearing, Ms. Beaver asked to amend her alleged onset date to January 1, 2021.  (Tr. 291.)  The ALJ granted that request and issued an unfavorable opinion on December 7, 2021.  (Tr. 12-33.)  Ms. Beaver's request for review of the decision by the Appeals Council was denied on September 29, 2022, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-6.)  Ms. Beaver filed her Complaint seeking judicial review on November 28, 2022.  (ECF Doc. 1.)  The case is fully briefed and ripe for review.  (ECF Docs. 9, 11, 12.)

## II.  Evidence

### A.  Personal, Educational, and Vocational Evidence

Ms. Beaver was born in 1969 and was 51 years old on the alleged disability onset date, making her an individual closely approaching advanced age under Social Security regulations.  (Tr. 26.)  She had at least a high school education.  (*Id*.)  She previously worked as a customer service representative, a nurse assistant, and an activity director.  (Tr. 25-26, 68-69.)

At the time of her hearing, Ms. Beaver was working part time—approximately 30 hours per week—as a preschool teacher for children from three years old through fifth grade.  (Tr. 43-45.)  She had been working in that job since 2019.  (Tr. 47.)  Following a discussion on the record and the submission of additional pay records, Ms. Beaver requested that her alleged onset date be amended from February 1, 2017, to January 1, 2021, asserting that she was unable to work at substantial gainful activity ("SGA") levels starting in 2021.  (Tr. 50-54, 279-90, 291.)  The ALJ noted that the pay records for 2021 reflected earnings above SGA levels in the third quarter of 2021, but did not specifically find that Ms. Beaver was not disabled at Step One; instead, he found her not disabled at Step Five.  (Tr. 18 (citing Tr. 279-90).)

**B.     Medical Evidence**

Although the ALJ identified numerous medically determinable impairments—mental and physical, severe and nonsevere (Tr. 18-19)—this appeal challenges the ALJ's findings with respect to: subjective complaints of pain and diabetes symptoms; the persuasiveness of a treating provider's physical medical source statement ("MSS"); and the adoption of a light RFC.  (ECF Docs. 9, 12.)  The evidence summarized herein focuses on the relevant impairments, primarily during the time following the alleged onset date of January 1, 2021.  (Tr. 291.)

**1.     Relevant Treatment History Prior to Alleged Onset Date**

Kedar Mahajan, M.D., Ph.D., a neuroimmunology fellow at Cleveland Clinic, saw Ms. Beaver in the Neurologic Institute on April 26, 2018, for complaints of sensory loss, urinary retention, and fecal incontinence.  (Tr. 1450.)  Dr. Mahajan provided a differential diagnosis of diabetic polyneuropathy, complications from abdominal hysterectomy, or perioperative cord ischemia.  (*Id.*)  A May 3, 2018 thoracic MRI showed "multiple small disc herniations" and "no cord compression."  (Tr. 1437-38.)  Head and abdominal CTs were performed on May 16, 2018. (Tr. 1442-43; 1444-46.)  The head CT revealed mild atrophy and mild white matter changes for which demyelinating process such as multiple sclerosis may be considered, but no evidence of acute bleed or skull fracture. (Tr. 1443.)  The abdominal CT revealed: possible mild sigmoid colitis and proctitis; likely small left renal cyst; mild fatty infiltration of liver.  (Tr. 1446.)

On October 11, 2018, Ms. Beaver saw J. Gregory Rosenthal, M.D., for follow up on her diabetic retinopathy.  (Tr. 1681-82.)  She complained of worsening blurry vision in her left eye. (Tr. 1681.)  Her moderate diabetic retinopathy was stable and her diabetic macular edema was treated.  (Tr. 1682.)  She had significant capillary compromise, macular ischemia, and possible unresolved refractive changes, and was advised to follow up in 9 months.  (*Id.*)

On February 9, 2019, a right foot x-ray revealed a mildly comminuted fracture of the mid to distal shaft of the first proximal phalanx, mildly displaced laterally 2 mm, with plantar apex angulation of the fracture of 35 degrees, soft tissue swelling, and findings consistent with prior x-rays.  (Tr. 570.)   Ms. Beaver had a normal colonoscopy in April 2019, performed by gastroenterologist David Hykes, Jr., D.O., at Firelands Physician Group.  (Tr. 1683-84.)

On July 24, 2019, Ms. Beaver saw Kasra Karamlou, M.D., a hematologist-oncologist at Cleveland Clinic, for "an opinion regarding management of elevated sedimentation rate, unintentional weight gain, and abnormal serum protein electrophoresis."  (*See* Tr. 1395-1404.) Ms. Beaver reported that she had lost a lot of weight.  (Tr. 1395.)  Dr. Karamlou observed that Ms. Beaver's diabetes was not very well-controlled; she had an elevated sed rate, a 70-pound unintentional weight loss, and somewhat abnormal serum protein electrophoresis.  (Tr. 1403.) Additional workup was scheduled, including a chest, abdomen, and pelvis CT to rule out any underlying malignancy.  (*Id.*)  A right toe fracture followed by orthopedics may have been attributed to her neuropathy, and she was to follow with orthopedics for her right toe.  (*Id.*)

On July 9, 2020, Ms. Beaver was taken to the emergency room at Promedica Memorial Hospital Fremont after a hypoglycemic event at work.  (Tr. 1562-67.)  She was given grape juice and chocolate, which elevated her blood sugar and relieved her low blood sugar symptoms.  (Tr. 1562-63.)  She complained of lower leg cramps and a sore throat, reporting that two children at her daycare had fevers and sore throats.  (Tr. 1562.)   Examination findings were unremarkable except for muscle aches and red, mildly enlarged tonsils.  (Tr. 1565.)  She was prescribed Flexeril, told to continue taking her diabetes medication, and discharged in stable condition. (*Id.*)

Ms. Beaver returned to gastroenterologist Dr. Hykes on August 5, 2020, complaining of unexplained weight loss, nausea, vomiting, and diarrhea.  (Tr. 1689.)  Her physical examination

findings were normal, except for mid abdominal tenderness.  (*Id.*)  Dr. Hykes indicated the etiology for Ms. Beaver's nausea, vomiting, and abdominal pain appeared to be related to gastroparesis, cyclic vomiting syndrome, and irritable bowel syndrome.  (*Id.*)  He started her on metoclopramide and hyoscyamine sulfate and ordered an abdominal x-ray.  (Tr. 1689-90.)

On December 16, 2020, Ms. Beaver had a diabetic eye examination with Eric Balthaser, O.D., of Parschauer Eye Center.  (Tr. 1514-1517.)  On examination, her vision was 20/40 on the right and 20/60 on the left, and her visual fields were full.  (Tr. 1515.)  Dr. Balthaser referred her for laser eye surgery, specifically a YAG capsulotomy.  (Tr. 1514, 2047.)

Ms. Beaver attended a new patient visit with Eric Dudenhoefer, M.D., on December 22, 2020, for a YAG evaluation.  (Tr. 1540-41.)  Her distance visual acuity was measured at 20/80 without correction on the right and 20/200 without correction on the left, but 20/100 on the left with pinhole testing.  (Tr. 1540.)  Her examination revealed diabetic retinopathy in both eyes and scattered dot/blot hemorrhages and microaneurysms in both maculae.  (Tr. 1541.)  Dr. Dudenhoefer diagnosed: posterior capsular opacity in both eyes; pseudophakia in both eyes; moderate nonproliferative diabetic retinopathy; and type-2 diabetes with ocular complications. (*Id.*)  He recommended blood sugar control and a laser capsulotomy.  (*Id.*)

### 2.    Relevant Treatment History After Alleged Onset Date

Ms. Beaver returned to see optometrist Dr. Balthaser on January 19, 2021.  (Tr. 1544-45.) Her distance visual acuity was measured at 20/70-2 without correction on the right and 20/200 without correction on the left, but was 20/100 on the left using pinhole testing.  (Tr. 1544.)  Her near visual acuity was 20/200 without correction on the right and 20/100 without correction on the left.  (*Id.*)  Her examination again revealed diabetic retinopathy in both eyes and scattered dot/blot hemorrhages and microaneurysms in both maculae; macular edema was also noted on the left but not on the right.  (Tr. 1545.)  Her diagnoses remained the same, with an added

diagnosis of diabetic macular edema in the left eye.  (*Id.*)  Ms. Beaver was advised to return in three months for follow up regarding her macular edema. (*Id.*)

On that same date, January 19, 2021, Ms. Beaver attended a new patient visit with Kendra Schlachter, APRN-CNP, at Promedica Family Practice—Fremont.  (Tr. 1553-54.)  She reported a history of type-2 diabetes, hypertension, hyperlipidemia, and depression; she was following with endocrinology and used an insulin pump.  (Tr. 1554.)  She complained of recent focus and memory issues, a suspicion of rheumatoid arthritis, pain and swelling in her hands, and concerns about kidney function related to a recent ER visit.  (*Id.*)  Physical and mental status examination findings were normal, with no swelling or redness noted in her bilateral hands.  (Tr. 1555.)  CNP Schlacter ordered a comprehensive metabolic panel, testing relating to reported arthralgia of multiple joints, and a brain MRI; she also planned a nephrology referral.  (Tr. 1556.)  Ms. Beaver agreed to call Firelands Counseling Center for reported depression.  (*Id.*)

Dr. Dudenhofer performed a YAG capsulotomy of Ms. Beaver's left eye on January 20, 2021, and a YAG capsulotomy of her right eye on January 27, 2021.  (Tr. 1546-47.)  Ms. Beaver attended a post-operative follow-up with Amy Drossman, O.D, on February 10, 2021.  (Tr. 1679-80.)  On examination, her distance vision was 20/30 in the right eye without correction and 20/80 in the left eye without correction; her left eye was 20/60-1 with pinhole testing.  (Tr. 1679.)  Dr. Grossman noted a good postoperative appearance in both eyes, and recommended a prescription change and progressive lenses for Ms. Beaver's glasses, with follow up in one year.  (Tr. 1680.)

Ms. Beaver attended a telehealth assessment with Andrea Kauble, LSW, of Firelands Regional Medical Center, Counseling & Recovery Services, on January 29, 2021.  (Tr. 1627-33.)  She reported struggling to adjust to major changes in her physical health, and reported the following symptoms: lack of motivation, social isolation, problems with sleep, eating and self-

care, and suicidal ideation. (Tr. 1632.) She said she lost her job because of Covid-19, had to find a new place to live, was going back to school for a master's degree, and had her two grandchildren—ages 2 and 5—every weekend because her son could not see them without supervision. (Tr. 1627.) She presented with a sad/depressed mood and flat affect, but other mental status findings were unremarkable. (Tr. 1630-31.) LSW Kauble recommended individual therapy and community psychiatric supportive treatment. (Tr. 1632.)

On February 2, 2021, Ms. Beaver was taken to the emergency department at Promedica Memorial Hospital by EMS after experiencing low blood sugar at work. (Tr. 1642-48.) EMS gave her food and juice, which raised her blood sugar. (Tr. 1642.) Examination findings and a chest CT were unremarkable. (Tr. 1642-45.) The clinical impression was a hypoglycemic episode in a patient with diabetes mellitus. (Tr. 1644.) She was discharged in stable condition and advised to monitor her blood sugar and follow up with her doctor. (*Id.*)

A brain MRI performed on February 3, 2021, was found to be suggestive of age and chronic small vessel microvascular ischemic change without evidence of acute intra cranial abnormality. (Tr. 1650-52.)

Ms. Beaver attended a follow-up visit with primary care provider CNP Schlacter on February 4, 2021. (Tr. 1638-41.) With respect to her recent ER visit, Ms. Beaver said that her endocrinologist had been changing medications, which contributed to blood sugar issues. (Tr. 1639.) She also complained of fatigue, shortness of breath, and memory problems. (*Id.*) Examination findings were unremarkable. (Tr. 1639-40.) CNP Schlacter advised Ms. Beaver to remain off work for a week and follow up in three weeks. (Tr. 1641.) She referred Ms. Beaver to neurology for reported memory loss, advised her to keep appointments with rheumatology and endocrinology, and noted that she needed blood pressure and blood sugar control. (Tr. 1640-41.)

Ms. Beaver reported to the emergency department at Promedica Memorial Hospital Fremont on April 30, 2021, with complaints of abdominal pain and vomiting.  (Tr. 1868-89.) She had abdominal tenderness, but examination findings were otherwise unremarkable.  (Tr. 1875-76.)  A CT of her abdomen and pelvis showed no evidence of acute pathology.  (Tr. 1886-87.)  She was discharged home and instructed to follow up with primary care.  (Tr. 1870.)  A fluoroscopy of her upper GI on May 12, 2021, showed intermittent lack of relaxation of the gastroesophageal sphincter and normal gastric motility.  (Tr. 1890-91.)

Ms. Beaver returned to the emergency department at Promedica Memorial Hospital Fremont on May 16, 2021, complaining of two days of abdominal pain and chest pressure with intermittent vomiting and dizziness for the past month.  (Tr. 1915-22.)  She had mild abdominal tenderness, but examination findings remained otherwise unremarkable.  (Tr. 1917-18.)  A chest x-ray showed no acute findings.  (Tr. 1919.)  A CT of her abdomen and pelvis showed a stable left adrenal adenoma, left lower pole renal cyst, suggestion of diffuse fatty liver, evidence of a prior cholecystectomy, and uncomplicated diverticulosis; otherwise, no acute intraabdominal pathology was identified.  (Tr. 1919-20.)

Ms. Beaver was admitted to the hospital on May 16 (Tr. 1921-22) and discharged on May 21, 2021 (Tr. 1893-97).  An upper GI endoscopy revealed mildly severe reflux esophagitis with no bleeding, erosive gastropathy with no bleeding and no stigmata of recent bleeding, and a normal duodenum.  (Tr. 1913-14, 1955-56.)  Surgical pathology for her stomach revealed H. pylori associated active chronic gastritis.  (Tr. 1971-72.)  An echocardiogram revealed normal systolic function with an ejection fraction of 55-60% and moderate left ventricle hypertrophy. (Tr. 1956-57.)  A gastric emptying study revealed severely delayed gastric emptying.  (Tr. 1964-67.)  Her diagnoses included gastroparesis, esophagitis, type-2 diabetes with an A1c of 12.3,

poorly controlled hypertension with moderate left ventricle hypertrophy, chronic kidney disease with stable renal function, and fatty liver. (Tr. 1893.) She was started on Reglan and felt much better. (Tr. 1894.) Her blood pressure was better controlled after starting amlodipine. (*Id.*) She was discharged home with instructions to better control her blood pressure and blood sugars, and to follow up with her gastroenterologist, endocrinologist, and primary care provider. (*Id.*)

Ms. Beaver followed up with gastroenterologist Dr. Hykes at Firelands Physician Group on June 1, 2021, reporting limited benefit since resuming Reglan. (Tr. 1687-1688.) Her examination findings were unremarkable. (Tr. 1687.) Dr. Hykes diagnosed gastroparesis, GERD with esophagitis, and H. pylori infection. (*Id.*) He noted that her symptoms remained poorly controlled, continued her existing medications, and increased Reglan. (*Id.*)

Ms. Beaver attended a new rheumatology consultation with Margaret Tsai, M.D., at the Cleveland Clinic on June 9, 2021, to evaluate her joint pain. (Tr. 1809-1816.) She complained that her fingers locked and cramped, worsening in humid and rainy weather. (Tr. 1809.) She had recently started Lyrica for diabetic neuropathy. (*Id.*) Many examination findings were within normal limits, including a normal gait, no joint deformities, and no clinical synovitis. (Tr. 1813.) But Ms. Beaver did exhibit joint tenderness and decreased range of motion due to pain. (*Id.*) Dr. Tsai noted findings consistent with lumbago with sciatica, multiple trigger fingers, and secondary osteoarthritis of multiple joints, and indicated that she would complete her workup. (Tr. 1814.) She diagnosed secondary osteoarthritis of multiple sites and trigger index finger of left hand. (Tr. 1813.) Her recommendations included blood testing, x-rays, and consultations with orthopedics, podiatry, and pain management. (Tr. 1814.) She also recommended interventions such as heat, ice, over the counter arthritis creams, and low impact weightbearing exercises as tolerated. (Tr. 1814-15.) X-rays of Ms. Beaver's bilateral hands and hips were unremarkable. (Tr. 1797, 1801.) Her lumbar x-ray showed mild degenerative changes. (Tr.

1799.)  X-rays of her bilateral feet showed bilateral hallux valgus deformities and plantar

calcaneal enthesophytes.  (Tr. 1803.)

    Ms. Beaver attended a new patient assessment for bilateral hand trigger fingers with

Yirka Vacca, PA-C, and Kirk Haidet, M.D., on June 28, 2021, at Cleveland Clinic Orthopaedics.

(Tr. 1740-45.)  Ms. Beaver reported that she had not experienced any clicking, catching, or

locking of any of her fingers for the past month; she believed her orthopedic appointment was for

her back and hip.  (Tr. 1740.)  Hand examinations revealed no abnormalities in appearance or

function.  (Tr. 1743-44.)  Ms. Beaver was directed to make a new appointment if symptoms of

clicking, catching, or locking returned, to be evaluated for a potential injection.  (Tr. 1744.)

    Ms. Beaver also presented for a diabetic foot check with Colleen Marie Debarr, DPM at

Cleveland Clinic podiatry on June 28, 2021.  (Tr. 1758-60.)  She reported neuropathy, being

unable to bend her right toe since a fracture in 2016, and foot drop.  (Tr. 1758.)  Physical

examination findings included deformity, bunion, and prominent metatarsal heads on both feet,

diminished sensation to the distal feet and lower legs, diminished vibratory perception, and

diminished muscle strength in the right leg, 2+/5 in the right foot.  (Tr. 1758-59.)  Dr. Debarr

noted that Ms. Beaver complained of right foot drop, but her examination revealed a normal,

intact gait.  (Tr. 1759.)  Dr. Debarr noted the following foot x-ray findings: "Large bilateral

plantar calcaneal enthesophytes are present left greater than right. Bilateral hallux valgus

deformities are present of moderate severity. Degenerative changes also seen in the right and left

fifth MTP joint." (*Id*.)  Dr. Debarr diagnosed secondary osteoarthritis of multiple sites, type-2

diabetes with diabetic polyneuropathy, right foot trop, and heel spur.  (*Id.*)  Treatment

recommendations included: conservative management; supportive diabetic shoes to stabilize,

maximize mobility, alleviate pain, and "prevent further suffering and control further progression

of the deformity"; ankle strapping on right foot; vitamin B supplements; and evaluation with orthopedics for evaluation of back/foot drop/neuropathy.  (Tr. 1760.)

Ms. Beaver attended a pain management initial evaluation with Girgis E. Girgis, D.O., of the Cleveland Clinic on July 12, 2021.  (Tr. 1714-19.)  She complained of radiating lower back and right hip pain for a year. (Tr. 1714, 1719.)  Physical and neurological examination findings were unremarkable, including intact sensation, normal gait, and lack of reproducible pain.  (Tr. 1718.)  Dr. Girgis reviewed the June 9, 2021 lumbar x-ray, which revealed mild multilevel degenerative changes and mild facet arthropathy.  (Tr. 1718-19.)  Dr. Girgis diagnosed lumbar degenerative disc disease, started tizanidine and Tylenol, and referred Ms. Beaver for physical therapy.  (Tr. 1719.)  Ms. Beaver was also advised to consider a lumbar MRI and a lumbar epidural injection, and to follow up with pain management in eight weeks.  (*Id.*)

Ms. Beaver returned to the emergency department at Promedica Memorial Hospital Fremont via EMS on July 22, 2021, with complaints of hypoglycemia.  (Tr. 1996-2006.)  A chest x-ray and brain CT did not reveal acute findings.  (Tr. 2001.)  Ms. Beaver was arousable but somewhat somnolent on examination; other findings were unremarkable.  (Tr. 1998-99.)  She reported increasing hypoglycemic episodes—at least weekly, and daily for the past week—since starting Farxia in addition to insulin several months before.  (Tr. 1982, 1990.)  She was admitted to monitor her glucose.  (Tr. 1990.)  Examination findings were unremarkable.  (Tr. 1994-95.)  She stabilized with no further hypoglycemia and was discharged in stable condition on July 23, 2021; she was advised to stop Farxiga, continue using her insulin pump, and follow up with primary care or endocrinology in the next one to two weeks to discuss changes in her therapy. (Tr. 1982-83, 1987, 1995.)

C.    **Function Report**

Ms. Beaver completed an Adult Function report on June 1, 2020.  (Tr. 337-50.)  She reported that her ability to work was limited by: diabetes, with frequent low blood sugar causing dizziness, nausea, sweating, and inability to drive; neuropathy, which caused balance issues and frequent falls; arthritis in hands and feet; and diminished vision caused by retinopathy in both eyes.  (Tr. 337.)  She also reported that her neuropathy caused insomnia.  (Tr. 338.)

She used a shower chair for balance, but was able to dress, care for her hair, and feed and toilet independently.  (Tr. 338.)  She cooked daily but could not open jars due to arthritis and sometimes had no appetite.  (Tr. 339.)  She cleaned and did laundry, spending about two to four hours weekly on these tasks; she did not vacuum.  (*Id.*)  Ms. Beaver drove, went outdoors daily, and went out alone.  (Tr. 340.)  She shopped in stores once or twice a week for about an hour and could manage her finances.  (*Id.*)  She read, watched television, and listened to music daily, but read less because of vision loss.  (Tr. 341.)  She visited or had phone calls with others three to four times per week.  (*Id.*)  She went to work and home on a regular basis, but said she sometimes needed to be accompanied when she did not feel well or her pain level was high.  (*Id.*)

She said she stayed home more due to her conditions and had trouble with most physical positions, but was not affected mentally except for concentration and memory.  (Tr. 342.)  She could walk for 15-20 minutes, after which she needed a 10-15-minute rest.  (*Id.*)  She could pay attention 20-30 minutes, sometimes less.  (*Id.*)  She could follow written instructions and usually verbal instructions.  (Tr. 342-43.)  She got along with authority figures and handled changes in routine, but sometimes experienced depression or anxiety because of stress.  (Tr. 343.)  She wore glasses and took Novolog for diabetes/low blood sugar.  (Tr. 343-44.)

D.     **Opinion Evidence**

1.     **Consultative Psychological Examination**

Thomas Evans, Ph.D., provided a state consultative psychological evaluation and report

on September 21, 2020.  (Tr. 1386-90.)  In preparing his report, he met with Ms. Beaver for a

clinical interview, reviewed her SSA Forms-3368 and 3373, and reviewed a "Medical Note dated

9/18."  (Tr. 1386.)  Ms. Beaver reported she was working 32 hours per week for ABC Academy,

where she "home school[ed] children."  (Tr. 1387.)  She affirmed that her psychiatric symptoms

affected her in the workplace, and said her health issues and mental health symptoms caused her

to call in sick or leave early.  (*Id.*)  She reported getting along with coworkers and denied

problems with authority.  (*Id.*)  She reported that she was able to drive, shared cooking and

cleaning duties with her adult son, grocery shopped with her son, and managed her own finances.

(*Id.*)  A typical day started at 5:00 a.m., ended at 10 p.m., and involved a day of work, a nap after

work, dinner with her son, and TV or relaxing before bed.  (*Id.*)

Ms. Beaver was cooperative and friendly on examination, and Dr. Evans observed no

issues with ambulation or gait and no physical distress once she was seated.  (Tr. 1387-88.)  Her

mood was euthymic, her speech was normal, and she maintained good eye contact; however, she

complained of daily depression for the past two months, with a history of depression since 1999.

(Tr. 1388.)   She also reported symptoms of anxiety since 1999, worsening in 2017, but Dr.

Evans did not observe noted features of anxiety during the examination.  (*Id.*)  She was fully

oriented, with adequate cognitive functioning, insight, and judgment.  (Tr. 1388-89.)

Dr. Evans diagnosed Ms. Beaver with persistent depressive disorder, moderate with

anxious distress.  (Tr. 1389.)  His functional assessment included the following findings:

- "[S]he would not appear to have difficulties understanding, remembering or carrying
  out simple to moderately complex instructions in a workplace setting" (Tr. 1389);

- She "displayed good attention and concentration" and "was able to maintain focus without any difficulties" (*id.*);

- She "denied having any difficulties getting along with fellow coworkers or bosses" or "getting along with authority figures or follow[ing] directives" (*id.*); and

- She "reported that her mood and anxiety symptoms have affected her in the workplace mainly due to attendance.  She stated that if she is not having a good day physically, this significantly increase[s] her mood and anxiety symptoms and she finds it difficult to stay at work.  At times she would have to call in sick.  If she is feeling fine physically, then this is less of an issue for her." (Tr. 1389-90).

### 2.  State Agency Medical Consultants

On June 24, 2020, state agency medical consultant Dana Schultz, M.D., opined that Ms. Beaver had the following physical RFC: she could occasionally lift and/or carry up to twenty pounds and frequently lift and/or carry up to ten pounds; she could stand and/or walk up to six hours in an eight hour workday, and sit up to six hours in an eight hour workday; she could constantly balance; she could frequently stoop, kneel, crouch, or crawl; she could occasionally climb ramps or stairs; she could never climb ladders, ropes, or scaffolds; she could frequently handle or finger with her right upper extremity; and she must avoid all exposure to unprotected heights, heavy machinery, and commercial driving.  (Tr. 82-84, 92-94.)

On April 5, 2021, on reconsideration, state agency medical consultant Abraham Mikalov, M.D., agreed with Dr. Schultz's physical RFC findings.  (Tr. 104-07, 116-19.)

### 3.  State Agency Psychological Consultants

On September 30, 2020, state agency psychological consultant Robyn Murry-Hoffman, Psy.D., completed a Psychiatric Review Technique ("PRT") (Tr. 80, 90) and mental RFC assessment (Tr. 84-85, 94-95).  In the PRT, she concluded that Ms. Beaver had mild limitations in understanding, remembering, or applying information and interacting with others, and moderate limitations in concentrating, persisting, or maintaining pace and adapting or managing herself.  (Tr. 80, 90.)  In the mental RFC, she opined that Ms. Beaver was capable of

understanding and remembering simple work instructions, sustaining concentration and persisting in simple, unskilled work tasks, and carrying out tasks where duties are static and changes can be explained.  (Tr. 84-85, 94-95.)

On March 17, 2021, on reconsideration, state agency psychological consultant Arcelis Rivera, Psy.D., agreed with Dr. Murry-Hoffman's PRT and mental RFC findings.  (Tr. 102-03, 107-08, 114-15, 119-20.)

### 4. Treating Provider Medical Opinions

Ms. Beaver's primary care provider, CNP Schlacter, completed two medical opinions: a physical MSS dated March 30, 2021 (Tr. 1698-1701); and a mental impairment questionnaire dated September 27, 2021 (Tr. 1842-1843).

### i. Physical MSS – April 2021

In her April 2021 physical MSS, CNP Schlacter noted that Ms. Beaver was diagnosed with type-2 diabetes, chronic kidney disease, gastroparesis, neuropathy, had a fair prognosis, and suffered symptoms that included fatigue, pain, and nausea.  (Tr. 1698.)  Clinical findings and objective signs included: "diagnosed neuropathy" and "palpable pain in back/hips."  (*Id.*)  Pain was described as: "pain in back/hips rate 6/10 can be 10/10" and "sitting, walking."  (*Id.*)  Ms. Beaver was noted to be taking Lyrica, which resulted in a "slight decrease in pain."  (*Id.*)

CNP Schlacter then offered the following opinions as to Ms. Beaver's physical RFC.  (Tr. 1699-1701.)  She opined that Ms. Beaver could: sit for ten minutes at a time, and for less than two hours in an eight-hour workday; and stand for twenty minutes at a time, and for less than two hours in an eight-hour workday.  (Tr. 1699.)  She opined that Ms. Beaver would need to walk around for five minutes every hour and would need three unscheduled 10-minute breaks every day because of muscle weakness, chronic fatigue, and pain.  (*Id.*)  She opined that Ms. Beaver did not need an assistive device, did not need to elevate her legs, and did not have any

significant limitations with reaching, handling, or fingering.  (Tr. 1699-1700.)  However, she

opined that Ms. Beaver could never lift and carry even ten pounds.  (Tr. 1700.)

CNP Schlacter opined that Ms. Beaver would likely be off task "25% or more" of the

workday due to symptoms severe enough to interfere with the attention and concentration needed

to perform simple work tasks, and would be incapable of performing even "low stress" work.

(Tr. 1700.)  In support, CNP Schlacter explained that Ms. Beaver had "fatigue + memory issues."

(Tr. 1701.)  She also opined that Ms. Beaver and would likely be absent more than four days per

month due to her impairments or treatment.  (*Id.*)  CNP Schlacter opined that Ms. Beaver's

impairments were reasonably consistent with the symptoms and functional limitations that she

provided in the opinion, explaining that Ms. Beaver "has diagnosed neuropathy, follows pain

management[, and] sees neurology."  (*Id.*)

### ii.  Mental Impairment Questionnaire – September 2021

CNP Schlacter completed a mental impairment questionnaire in September 2021, five

months after completing the physical MSS.  (Tr. 1842-43.)  She reported treating Ms. Beaver for

a total of nine months, seeing her every three months.  (Tr. 1842.)  Her diagnoses included type-

2 diabetes, hypertension, chronic pain, sleep apnea, and short-term memory loss.  (*Id.*)  Asked to

provide clinical findings demonstrating the severity of Ms. Beaver's mental impairments and

symptoms, CNP Schlacter wrote: "neurology exam normal, believe her mental impairment is due

to sleep apnea."  (*Id.*)  She opined that Ms. Beaver's prognosis was good and her mental

impairments could *not* be expected to last at least twelve months.  (*Id.*)  She then rated Ms.

Beaver as "limited but satisfactory" for all categories of mental function related to sustained

concentration and persistence (*id.*) and understanding and memory (Tr. 1843).  She indicated that

Ms. Beaver's functioning was "unlimited or very good" with respect to social interaction and

adaptation.  (*Id.*)  CNP Schlacter did not anticipate that Ms. Beaver would be absent from work or off task from performing job tasks because of her impairments.  (*Id.*)

E.     **Hearing Testimony**

    1.     **Plaintiff's Testimony**

Ms. Beaver appeared for a telephonic hearing on October 14, 2021.  (Tr. 34-74.)   She was represented by counsel.  (Tr. 37.)  She was 52 years old and had been separated from her husband since 2018.  (Tr. 41-42.)  She had two grown children and nine grandchildren, one of whom was under six years of age.  (Tr. 42-43.)  The youngest, a three-year-old, used to stay with her and her son every other weekend, until shortly before the hearing when Ms. Beaver moved into her own apartment.  (Tr. 43, 62.)

Ms. Beaver earned a master's degree in 2017 while working as a customer service representative at a factory.  (Tr. 45, 47-48.)  Her prior work included activities director at a retirement home and a state trained nurse aide.  (Tr. 47-49.)  She lost her job at the factory in 2019 because of H. Pylori symptoms, which included about 75 pounds of unintended weight loss.  (Tr. 41, 49-50.)

At the time of the hearing, Ms. Beaver was working about thirty hours per week as a preschool teacher, earning $10.25 per hour.  (Tr. 43-44.)  She worked five days per week, from noon until six, with three-year-olds and elementary-school-aged children.  (Tr. 44.)   She said she did not work with toddlers because she was not able to pick them up.  (Tr. 45.)

Ms. Beaver drove herself to work each day, a five-minute drive, and also drove to medical appointments once or twice a week and to physical therapy.  (Tr. 46.)  Driving was more difficult because of her retinopathy, which affected her peripheral vision and made her eyes tired.  (*Id.*)  Ms. Beaver said she did not always work 30 hours per week, and had low attendance related to her health issues.  (Tr. 52.)  She was only paid when she worked.  (Tr. 53.)

The ALJ questioned Ms. Beaver and her counsel about her earnings and work schedule, noting that earnings for a 30-hour workweek at $10.25 per hour would bring her earnings above SGA levels.  (Tr. 51-54.)  But Ms. Beaver was unsure if she worked for the full 30 hours during any week that year.  (*Id.*)  Her attorney said he would submit her paystubs so that the matter could be resolved.  (Tr. 55.)  Ms. Beaver said she had called off from work at least once a week in September 2021.  (Tr. 56.)  She also said she had been talked to by her employer about her poor attendance.  (*Id.*)  She was not threatened with termination, but said other employees were fired for attendance issues.  (*Id.*)

Ms. Beaver reported having chronic kidney disease, which caused nausea and vomiting. (Tr. 54.)  She was recently diagnosed and was told she had stage 3A.  (*Id.*)  She was started on Lisinopril but had not yet noted an effect on her symptoms.  (*Id.*)  She also had diabetes, which was not well controlled because of trouble finding the right medications to take.  (Tr. 57.)  She was starting to work with a medication therapist—a doctor who specializes in medication and works with her primary care provider—to try to find a better medication regimen.  (*Id.*)

Regarding her neuropathy, she said she could not feel her legs from the knees down; it felt like the bottom half of her legs was always asleep.  (Tr. 57.)  She could walk but it was painful, and she could not feel it if she stepped on something very hot.  (*Id.*)  Her doctor tested the feeling in her feet by poking her with needles while her eyes were shut, and she could not feel it.  (Tr. 58.)  But she could feel the pedals in the car well enough to drive and always wore shoes.  (Tr. 58-59.)  She stood up for about half of her shift at the daycare; she also stood up to cook meals, but used the crockpot a lot.  (Tr. 57, 59.)  She took Lyrica for her neuropathy, and it helped a little with no side effects; her dosage was recently increased by her neurologist.  (Tr. 60-61.)

18

Asked by the ALJ whether she had any more to add, Ms. Beaver stated that her life had changed a lot.  (Tr. 61.)  She used to be much more active and social, but symptoms like back pain limited her.  (Tr. 62.)  Her vision was also diminishing, especially her distance vision, which affected night driving.  (Tr. 64.)  The longest she could stand while cooking was 20 minutes.  (Tr. 65.)  At work, she would sit down every 15 to 20 minutes to rest her hip, sitting for 5 to 10 minutes.  (Tr. 66.)  Ms. Beaver was in physical therapy to try to improve symptoms, but that made her sore.  (*Id.*)  She was allergic to pain medication.  (*Id.*)

## 2. Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing.  (Tr. 68-69.)  The VE classified Ms. Beaver's past relevant work as: customer service representative, a sedentary, semi-skilled job; nurse assistant, a semi-skilled job classified at medium and performed at heavy; and activity director, a light, skilled job.  (*Id.*)  He testified that a hypothetical individual of Plaintiff's age, education, and work experience, with the functional limitations described in the RFC determination, could not perform Ms. Beaver's past relevant work but could perform representative positions in the national economy, including mail room clerk, merchandise marker, or hand packager inspector.  (Tr. 70.)  The VE testified that those jobs would be expected to include normal breaks, including two 10-15 minute breaks and 30-45 minutes for lunch.  (*Id.*)  If the hypothetical individual would be absent more than two days a month on an ongoing basis, or would be off-task more than 10% of the workday, the VE testified that would preclude competitive employment.  (*Id.*)

## III. Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work. If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the

Residual Functional Capacity ("RFC") and vocational factors to perform other work available in the national economy.  *Id.*

## IV.    The ALJ's Decision

In his December 7, 2021 decision, the ALJ made the following findings:[1]

1.    The claimant met the insured status requirements of the Social Security Act through December 31, 2024.  (Tr. 18.)

2.    The claimant had engaged in substantial gainful activity since January 1, 2021, the application date.  (*Id.*)

3.    The claimant had the following severe impairments: obesity, depression, anxiety, diabetic retinopathy, and diabetes mellitus.  (*Id.*)

4.    The claimant did not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 19.)

5.    The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except never climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs, frequently stoop, kneel, crouch and crawl; avoid all exposure to hazardous machinery and unprotected heights; no commercial driving, never operate foot controls; can understand, remember, and carry out simple instructions; Perform simple, routine, and repetitive tasks but not at a production rate pace such as an assembly line; adapt to routine changes in the workplace that are infrequent and easily explained.  (Tr. 22.)

6.    The claimant is unable to perform any past relevant work.  (Tr. 25.)

7.    The claimant is currently an individual closely approaching advanced age.  (Tr. 26.)

8.    The claimant has at least a high school education.  (*Id.*)

9.    Transferability of job skills is not material to the determination of disability.  (*Id.*)

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.  (*Id.*)

---

[1] The ALJ's findings are summarized.

Based on the foregoing, the ALJ determined that Plaintiff had not been under a disability, as defined in the Social Security Act, from the time she turned age 18 in June 2018, through the date of the decision on July 6, 2021. (Tr. 27.)

### V. Plaintiff's Arguments

Ms. Beaver presents the following arguments for this Court's review:

1. The ALJ erred when he failed to properly apply SSR 16-3p and failed to find that the intensity, persistence and limiting effects of Ms. Beaver's symptoms precluded her form engaging in substantial gainful activity on a full-time and sustained basis.

2. The ALJ erred when he failed to find that the opinion of a treating source was consistent with and supported by the medical evidence and failed to incorporate the stated limitations into the RFC.

3. The ALJ erred at Steps Four and Five because substantial evidence did not support the RFC finding that Ms. Beaver could perform work at the light level of exertion.

(ECF Doc. 9, pp. 1, 9, 16, 20.)

### VI. Law & Analysis

#### A. Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). "Substantial evidence is more than a scintilla of evidence but less

22

than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004))). A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.      First Assignment of Error: Whether ALJ Appropriately Considered Subjective Complaints**

In her first assignment of error, Ms. Beaver argues that the medical evidence supports and is consistent with her subjective complaints regarding pain and diabetes symptoms, including neuropathy and retinopathy, and that the evidence "establishe[s] that she [i]s unable to work on a full-time basis." (ECF Doc. 9, pp. 9-13.)  She acknowledges that the ALJ "mentioned [her] pain throughout the decision" and "mentioned both neuropathy and retinopathy in his analysis," but argues that the ALJ failed to properly consider her diabetic complications under SSR 14-2p, erred in finding her symptoms were not entirely consistent with the medical evidence, and "misstated the evidence" in finding she was not more limited.  (*Id.* at pp. 13-14.)  She also argues that the ALJ provided insufficient analysis to comply with Social Security Ruling ("SSR") 16-3p and failed to build a logical bridge from the evidence to the result.  (*Id.* at pp. 14-16.)

The Commissioner argues in response that many of the above arguments were waived for lack of adequate argumentation.  As to SSR 16-3p, the Commissioner argues Ms. Beaver "neglects to specify which of the criteria were improperly applied." (ECF Doc. 11, p. 3.)  As to SSR 14-2p, the Commissioner argues Ms. Beaver "fails to specify which part of the Ruling the ALJ violated, let alone *how* it was violated." (*Id.* at p. 4 (emphasis in original).)  As to the alleged misstatement of evidence, the Commissioner notes that Ms. Beaver "does not specify which evidence the ALJ purportedly 'misstated.'" (*Id.* at pp. 4-5.)  And to the extent that Ms. Beaver's arguments reference the ALJ's findings at Step Three, the Commissioner notes she has not stated an assignment of error relating to the ALJ's Step Three findings. (*Id.* at p. 5.)

The Court agrees that Ms. Beaver has failed to adequately develop any arguments that the ALJ misstated evidence, failed to comply with the requirements of SSR 16-3p or 14-2p, or erred in his Step Three analysis.  Any such arguments are accordingly deemed waived.  *See Hollon v.*

24

*Comm'r of Soc. Sec.*, 447 F.3d 477, 491 (6th Cir. 2006); *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.") (internal citations and bracket omitted).

Further, to the extent Ms. Beaver is simply arguing that her subjective complaints were supported by and consistent with the medical records (ECF Doc. 9, pp. 10, 13), her argument misapprehends the legal standard.  Even if a preponderance of the evidence supports a finding that the subjective complaints were supported by or consistent with the medical records, this Court cannot overturn the ALJ's finding to the contrary "so long as substantial evidence also support[ed] the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477; *Blakley*, 581 F.3d at 406.  Regardless of whether the evidence could support greater RFC limitations in line with Ms. Beaver's subjective symptom complaints, the question before this Court is whether there was substantial evidence to support the ALJ's finding to the contrary.

Accordingly, the Court's analysis will be limited to consideration of whether the ALJ erred in his analysis of Ms. Beaver's subjective complaints of pain or the reported symptoms of her diabetic neuropathy and diabetic retinopathy.

### 1.    Legal Standard for Evaluation of Subjective Symptoms

As a general matter, "an ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *Jones*, 336 F.3d at 476; *see also Alexander v. Kijakazi*, No. 1:20-cv-1549, 2021 WL 4459700, *13 (N.D. Ohio Sept. 29, 2021) ("An ALJ is not required to accept a claimant's subjective complaints.") (citing *Jones*, 336 F.3d at 476); see also 20 C.F.R. § 404.1529(a) and SSR 16-3p, *Evaluation of Symptoms in Disability Claims*, 82 Fed. Reg. 49462, 49463 (Oct. 25, 2017) (explaining that a claimant's statements of symptoms alone are not sufficient to establish the existence of a physical or mental impairment or disability) ("SSR 16-3p").

Under the two-step process used to assess the limiting effects of a claimant's symptoms, a determination is first made as to whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's symptoms.  SSR 16-3p, 82 Fed. Reg. 49462, 49463; *Rogers v. Comm'r Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (citing 20 C.F.R. § 416.929(a)).  If that requirement is met, the second step is to evaluate of the intensity and persistence of the claimant's symptoms to determine the extent to which they limit the claimant's ability to perform work-related activities.  SSR 16-3p, 82 Fed. Reg. 49462, 49463; *Rogers,* 486 F.3d at 247.  There is no dispute that the first step is met in this case (Tr. 23), so the discussion will focus on the ALJ's compliance with the second step.

In undertaking this analysis, an ALJ considers objective medical evidence, a claimant's subjective complaints, information about a claimant's prior work record, and information from medical and non-medical sources.  SSR 16-3p, 82 Fed. Reg. 49462, 49464-49466; 20 C.F.R. 404.1529(c)(3).  Factors relevant to a claimant's symptoms include daily activities, types and effectiveness of medications, treatment received to address symptoms, and other factors concerning a claimant's functional limitations and restrictions due to pain or other symptoms. SSR 16-3p, 82 Fed. Reg. at 49465-49466; 20 C.F.R. 404.1529(c)(3).

## 2.    Whether ALJ Appropriately Addressed Allegations of Pain

Ms. Beaver acknowledges that "the ALJ mentioned pain throughout the decision" (ECF Doc. 9, p. 13 (citing Tr. 22, 23, 24)), but argues that he erred in finding that Ms. Beaver could "engage in full-time and sustained activity" despite her pain (*id.* at pp. 13-14).  In support of this argument, she cites her rheumatology, orthopedics, and podiatry office visits in June 2021, her pain management office visit in July 2021, and various medical records that list "pain" as a diagnosis.  (*Id.* at p. 13 (citing, e.g., Tr. 1714, 1719, 1744, 1758, 1809, 1813).)

26

A review of the ALJ decision reveals that the ALJ considered Ms. Beaver's complaints of pain and her pain management treatment at Step Two, while noting her normal strength and gait and denial of problems with her hands.  (Tr. 18-19.)  At Step Four, he acknowledged her complaints of pain limiting her ability to stand and walk (Tr. 22-23), but found her statements concerning the intensity, persistence, and limiting effects of her symptoms were "not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in th[e] decision" (Tr. 23).  In support, his outline of the relevant evidence noted: her treatment for foot pain in 2019, medical advice to increase her physical activity, her denial of gait problems and arthralgias and normal range of motion findings in January and February 2021, her reports of going back to school and caring for her grandchildren, her intact gait at treatment visits in June 2021, findings of foot drop and decreased muscle strength in the right leg, her complaints of chronic foot pain, and x-rays showing bilateral hallux deformities.  (Tr. 23.)

The ALJ also considered the physical MSS of Ms. Beaver's treating provider, finding it not persuasive (Tr. 24),[2] and found the opinions of the state agency medical consultants that Ms. Beaver could perform light work with certain limitations to be "overall persuasive" (Tr. 24-25). After considering all that evidence, the ALJ found as follows:

> The undersigned finds the medical evidence of record to be more probative than the claimant's testimony and allegations. The claimant's allegations have been included in the residual functional capacity to the extent that they are consistent with the evidence as a whole.
>
> Specifically, the claimant's allegations that she could not work during the adjudicatory period are inconsistent with the records, in that throughout the adjudicated period she could get to appointments, do laundry and cleaning but no vacuuming, drive, shop, and mange a checking and savings account, and work part time (Testimony, 6E).

---

[2] Ms. Beaver's challenge to the ALJ's persuasiveness analysis with regard to this medical opinion will be addressed separately in section VI.C., *infra*.

The claimant's complaints have not been completely dismissed, but rather, have been included in the residual functional capacity assessment to the extent they are consistent with the evidence as a whole. . . .

For the above reasons, the undersigned finds the claimant's alleged symptoms and limitations are not fully consistent with the objective and other evidence of record. Thus, although these symptoms require limitations, as assessed in the residual functional capacity herein, the undersigned finds that the claimant retains the ability to engage in substantial gainful activity.

(Tr. 25.)

Thus, the ALJ acknowledged Ms. Beaver's allegations of pain, her pain management treatment (medication and a physical therapy referral), her podiatric findings and treatment (diabetic shoes, ankle strapping, and an orthopedic referral), and physical examination findings reflecting a normal gait, but with recent findings of foot drop and reduced strength in the right leg.  (Tr. 18-19, 23.)  The ALJ then found, based on the medical evidence and the evidence regarding Ms. Beaver's activities, that her impairments supported the physical limitations in the RFC but did not preclude full time work.  (Tr. 25.)  Ms. Beaver has not met her burden to show that the ALJ's analysis of her subjective complaints of pain failed to meet the regulatory standard, that the ALJ failed to provide a reasoned rationale for his findings, that the ALJ ignored evidence, or that the ALJ's findings lacked the support of substantial evidence.

### 3.    Whether ALJ Appropriately Addressed Diabetic Symptoms

Ms. Beaver also argues that the ALJ erred in his consideration of her diabetic symptoms, arguing that her "diabetes, diabetic retinopathy, and diabetic neuropathy limited her ability to sustain vision, stand/walk and use her hands on a sustained and full time basis."  (ECF Doc. 9, p. 14.)  Her underdeveloped arguments regarding SSR 14-2p, the listings, and unspecified misstatements (*id.*) are waived, as noted above.  But the Court will consider her argument that the ALJ did not consider her diabetic retinopathy or neuropathy in assessing her symptoms.

28

A review of the ALJ decision reveals that the ALJ considered Ms. Beaver's testimony that she avoided night driving due to decreased vision, had glasses, used a shower chair, had medication for neuropathy, had no problems with her hands, had neuropathy in her feet, with pain and numbness when walking, and had diabetes that was not controlled with medications. (Tr. 22-23.)  He found her impairments could reasonably be expected to cause some of the symptoms, but that her statements regarding the intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the medical and other evidence.  (Tr. 23.)

With respect to diabetic retinopathy, the ALJ discussed Ms. Beaver's treatment for retinopathy and macular edema in 2018, her eye exam findings in December 2020, shortly before the alleged onset date, her YAG capsulotomy with a good postoperative appearance, and her postoperative eye exam findings of 20/30 and 20/50 in February 2021.  (Tr. 23.)  With respect to diabetic neuropathy, the ALJ discussed records showing she was negative for gait problems and had a normal gait, records showing foot drop and chronic food pain, and records from July 2021 indicating her neuropathy was stable and that she had improved control of her type-2 diabetes. (*Id.*)  In discussing the medical opinion evidence, the ALJ found the physical RFC of the state agency medical consultants to be "overall persuasive to the extent that the claimant has diabetes [sic] retinopathy and diabetic neuropathy," and adopted proposed limitations in postural positions, foot controls, climbing, and exposure to hazardous machinery, unprotected heights, and commercial driving as a result.  (Tr. 24-25.)

In finding the medical record more probative than Ms. Beaver's subjective complaints, the ALJ highlighted Ms. Beaver's own reported ability to get to appointments, do laundry, clean, drive, shop, manage finances, and work part time.  (Tr. 25.)  And the ALJ noted that the subjective complaints were not completely dismissed but rather included in the RFC to the extent

consistent with the evidence as a whole.  (*Id.*)  Despite adequate vision to perform reported activities such as driving, cleaning, and part time work, the ALJ adopted an RFC precluding commercial driving and exposure to hazardous machinery or unprotected heights.  (*Id.*)  And despite normal gait and the same described activities, the ALJ adopted an RFC limiting climbing and precluding the use of foot controls.  (*Id.*)

Ms. Beaver has not met her burden to show that the ALJ's analysis of her subjective complaints relating to diabetic neuropathy or retinopathy failed to meet the regulatory standard, that the ALJ failed to provide a reasoned rationale for his findings, that the ALJ ignored relevant evidence, or that the ALJ's findings lacked the support of substantial evidence.  The ALJ weighed the evidence and credited Ms. Beaver's subjective allegations regarding her diabetes complications to the extent he found them supported by the record.

For the reasons set forth above, the undersigned finds the ALJ adequately considered the subjective allegations in the context of the record as a whole.  Accordingly, the undersigned finds Ms. Beaver's first assignment of error is without merit.

**C.**   **Second Assignment of Error: Whether ALJ Erred in Assessing Persuasiveness of Treating Source Opinion from CNP Schlacter**

In her second assignment of error, Ms. Beaver argues that the ALJ erred when he "failed to find" that the physical MSS of treating provider CNP Schlacter was consistent with and supported by the medical evidence, and when he failed to incorporate the stated limitations from that medical opinion into the RFC.  (ECF Doc. 9, pp. 1, 16-20.)

**1.**   **Framework for Evaluation of Medical Opinion Evidence**

The Social Security Administration's ("SSA") regulations for evaluating medical opinion evidence require ALJs to evaluate the "persuasiveness" of medical opinions "using the factors listed in paragraphs (c)(1) through (c)(5)" of the regulation.  20 C.F.R. § 404.1520c(a); *see Jones*

*v. Comm'r of Soc. Sec.*, No. 3:19-CV-01102, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020).

The five factors to be considered are supportability, consistency, relationship with the claimant,

specialization, and other factors.  20 C.F.R. § 404.1520c(c)(1)-(5).  The most important factors

are supportability and consistency.  20 C.F.R. §§ 404.1520c(a), 404.1520c(b)(2).  ALJs must

explain how they considered consistency and supportability, but need not explain how they

considered the other factors.  20 C.F.R. § 404.1520c(b)(2).

As to supportability, the regulations state: "The more relevant the objective medical

evidence and supporting explanations presented by a medical source are to support his or her

medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical

opinions or prior administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(1).  In

other words, "supportability" is the extent to which a medical source's own objective findings

and supporting explanations substantiate or support the findings in the opinion.

As to consistency, the regulations state: "The more consistent a medical opinion(s) or

prior administrative medical finding(s) is with the evidence from other medical sources and

nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior

administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(2).  In other words,

"consistency" is the extent to which a medical source's opinion findings are consistent with the

evidence from other medical and nonmedical sources in the record.

### 2. Whether ALJ Erred in Assessing Persuasiveness of Treating Provider CNP Schlacter's Medical Opinion

The ALJ evaluated the persuasiveness of CNP Schlacter's physical MSS as follows:

The claimant provided opinions from a treater, Kendra Schl[a]cter, CNP, in April 2021, with only a fair prognosis [].  It was opined that the claimant would be absent more than four days per month and was incapable of even low stress work and she would be off task more than 25 percent of the workday due to attention and concentration issues [].  It was opined she could never lift over ten pounds and she would need unscheduled breaks three times a day for ten minutes due to chronic

31

fatigue, muscle weakness, and pain and numbness []. It was opined she would need to walk sixty minutes a day for five minutes at a time and could only sit, stand, and walk less than two hours in an eight-hour workday []. She could stand for up to twenty minutes at a time and sit for only ten minutes at a time []. <u>The undersigned finds that this is not persuasive as it is inconsistent with and not supported by the claimant's ability to work part time and it is internally inconsistent with the claimant's mental questionnaire that she had satisfactory concentration and persistence</u> [].

(Tr. 24 (emphasis added) (citations omitted).)

Ms. Beaver argues first that the ALJ erred in considering her part time work because she "testified that she missed work once a week due to her symptoms," and the opined limitations were consistent with a person able to perform part-time work but not full-time work. (ECF Doc. 9, p. 18.) She also argues generally that the medical records supported and were consistent with a finding that she could not sustain full-time work activity. (*Id.* at pp. 18-19.) The Commissioner argues in response that it was reasonable for the ALJ to find the part time work described in Ms. Beaver's testimony to be inconsistent with CNP Schlacter's opinion that Ms. Beaver could not perform even "low stress" work, and could sit, stand, or walk for less than two hours per day. (ECF Doc. 11, pp. 5-6.)

As to Ms. Beaver's first argument, the ALJ was addressing consistency—the extent to which the opinion findings were consistent with evidence from other medical and nonmedical sources in the record, 20 C.F.R. § 404.1520c(c)(2)—when he found the limitations described by CNP Schlacter to be inconsistent with Ms. Beaver's "ability to work part time." (Tr. 24.) The limitations in the physical MSS included: very significant limitations in the ability to sit, stand, and walk; substantial off-task time and absenteeism; and an inability to perform even "low stress" work. (Tr. 1699-1701.) In contrast, Ms. Beaver testified in October 2021 that she was working from noon to 6:00 p.m., five days per week, caring for children between three years old and fifth grade, and that she was on her feet for about 50% of her six-hour shift. (Tr. 43-45, 58.)

32

She also testified that she had low attendance due to health issues (Tr. 52), was only paid when she worked (Tr. 53), called off work at least once per week in September 2021 due to low blood sugars (Tr. 55-56), and was talked to about her attendance in July 2021 (Tr. 56).  But the ALJ reviewed Ms. Beaver's later-submitted earnings records and found her earnings in the third quarter of 2021 (July through September) were above SGA levels.  (Tr. 18 (citing Tr. 279-90).)  Given the significance of the limitations described in CNP Schlacter's physical MSS and the evidence relating to Ms. Beaver's contemporaneous part time work, the Court finds Ms. Beaver has not met her burden to show that the ALJ lacked substantial evidence to support his finding that the opinion was inconsistent with the evidence concerning Ms. Beaver's part-time work.

As to Ms. Beaver's more general argument that the medical evidence "supported and was consistent with" an inability to perform full-time work (ECF Doc. 9, p. 18), such an argument again misapprehends the applicable legal standard.  Even if a preponderance of the evidence supports a finding that CNP Schlacter's medical opinion is persuasive, this Court cannot overturn the ALJ's finding to the contrary so long as substantial evidence also supported the conclusion reached by the ALJ.  *See Jones*, 336 F.3d at 477; *Blakley*, 581 F.3d at 406.

Ms. Beaver's conclusory argument that the ALJ failed to adequately explain his findings regarding supportability, consistency, and persuasiveness (ECF Doc. 9, p. 20) must also fail.  In addition to finding the opinion inconsistent with Ms. Beaver's ability to perform part time work, the ALJ addressed supportability—the extent to which CNP Schlacter's own objective findings and supporting explanations substantiated or supported her opinions, 20 C.F.R. § 404.1520c(c)(1)—when he found the opinion was "internally inconsistent" with a later mental impairment questionnaire in which CNP Schlacter found Ms. Beaver had "satisfactory concentration and persistence."  (Tr. 24 (citing Tr. 1842-43).)  In that second medical opinion,

prepared five months later, CNP Schlacter opined that Ms. Beaver had a "limited but satisfactory" ability to perform tasks involving sustained concentration and persistence, noting her normal neurology examination, and would not be absent or off task due to her impairments. (Tr. 1842.)  In contrast, she had opined in the earlier physical MSS that Ms. Beaver was likely to be off task 25% or more of the workday because her symptoms interfered with her attention and concentration, was incapable of even "low stress" work due to fatigue and memory issues, and would likely be absent more than four days per month.  (Tr. 1700-01.)  Ms. Beaver has failed to demonstrate that the ALJ's supportability finding lacked the support of substantial evidence.

The questions before this Court are whether the ALJ appropriately articulated his reasons for finding the opinion unpersuasive and made a determination that was supported by substantial evidence.[3]  *See* 20 C.F.R. § 404.1520c (governing how ALJs consider and articulate findings regarding medical opinions); 20 C.F.R. § 404.1520(e) (findings regarding RFCs will be "based on all the relevant medical and other evidence" in the case record); *see also Blakley*, 581 F.3d at 405 ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

For the reasons stated above, the undersigned finds Ms. Beaver has not met her burden to show that the ALJ's persuasiveness finding lacked the support of substantial evidence, or that he failed to sufficiently articulate his reasons for finding the opinion not persuasive.  Accordingly, the undersigned finds Ms. Beaver's second assignment of error is without merit.

---

[3] To the extent Ms. Beaver intended to also assert a separate challenge to the ALJ's finding that the state agency opinions were persuasive (*see* ECF Doc. 9, pp. 19-20), that argument was not clearly articulated or adequately developed and is deemed waived.  *See Hollon*, 447 F.3d at 491; *McPherson*, 125 F.3d at 995.

**D.     Third Assignment of Error: Whether Light Exertional RFC Was Supported by Substantial Evidence**

In her third assignment of error, Ms. Beaver argues that her diabetic neuropathy and pain, as supported by objective imaging, "limited her ability to stand/walk the requisite 6 hours a day for work at the light level of exertion" so that the ALJ lacked substantial evidence to support his finding that Ms. Beaver could perform light exertional work.[4]  (ECF Doc. 9, pp. 21-22.)  The Commissioner argues in response that Ms. Beaver has not provided any authority to support a finding that the medical findings required a limitation to sedentary work, and that Ms. Beaver is asking this Court to improperly reweigh the evidence.  (ECF Doc. 11, pp. 6-7.)

A claimant's RFC "is the most [she] can still do despite [her] limitations."  20 C.F.R. § 404.1545(a)(1).  An ALJ is charged with assessing a claimant's RFC "based on all the relevant evidence in [the] case record."  *Id.*; *see also* 20 C.F.R. § 404.1546(c) ("If your case is at the administrative law judge hearing level . . . , the administrative law judge . . . is responsible for assessing your residual functional capacity."); *Poe v. Comm'r of Soc. Sec.*, 342 Fed. App'x 149, 157 (6th Cir. 2009) ("The responsibility for determining a claimant's residual functional capacity rests with the ALJ, not a physician.").

Here, the ALJ concluded that Ms. Beaver had the following physical RFC:

> The claimant has the residual functional capacity to perform light work . . . except never climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs, frequently stoop, kneel, crouch and crawl; avoid all exposure to hazardous machinery and unprotected heights; no commercial driving, never operate foot controls. . . .

(Tr. 22.)  In support of this finding, the ALJ considered Ms. Beaver's subjective complaints (Tr. 22-23), discussed the findings in her medical records (Tr. 18-19, 23), assessed the persuasiveness

---

[4] Ms. Beaver bases her arguments in part on "the preceding Arguments" (ECF Doc. 9, p. 21), but this Court will not revisit those arguments or the Court's findings with respect to the prior assignments of error here.

of the medical opinions (Tr. 24-25), and explained his reasons for adopting the specified RFC in light of all of the evidence (Tr. 25).  As discussed in section VI.B., *supra*, the ALJ considered Ms. Beaver's pain and neuropathy before adopting an RFC that: limited the weight she could lift or carry; limited the need to stoop, kneel, crouch, or crawl; limited or precluded climbing; and prohibited the use of foot controls and exposure to hazardous machinery or unprotected heights.

Ms. Beaver argues that the ALJ's light RCF lacked the support of substantial evidence because of imaging that showed: a broken foot in 2019 (Tr. 570-71); small disc herniations of the thoracic spine in 2018 (Tr. 1437-39); mild white matter changes in her brain in 2018 (Tr. 1443); and small vessel microvascular ischemic change in her brain in February 2021 (Tr. 1650-52). (ECF Doc. 9, p. 22.)  There is nothing inherent to this evidence which would preclude a finding that an individual is capable of performing light exertional work, and Ms. Beaver has not provided any authority to establish otherwise.

"'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'"  *Blakley*, 581 F.3d at 406.  Thus, even if substantial evidence supported Ms. Beaver's argument that she could not perform light exertional work, this Court cannot overturn the ALJ's decision "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones*, 336 F.3d at 477. Here, the Court finds that substantial evidence supported the ALJ's finding that Ms. Beaver was capable of performing full-time work as set forth in the RFC.

For the reasons set forth above, the Court finds that the ALJ's adoption of a light exertional RFC was supported by substantial evidence.  Accordingly, the Court finds the third assignment of error to be without merit.

**VII.    Conclusion**

For the foregoing reasons, the Court **AFFIRMS** the Commissioner's decision.

July 31, 2024

                                        */s/Amanda M. Knapp*
                                        AMANDA M. KNAPP
                                        United States Magistrate Judge